I am Charles N. Davis. I represent Naaman Shepard, the owner of a relatively small family cruiser that nearly sank in normal operation. Now, what I read didn't make it clear to me. I know the Coast Guard arrived fairly quickly. Would the boat have sunk or was it designed in such a way that there were compartments that would have protected it against sinking? It would have gone down had the Coast Guard not arrived quickly. In any event, this is a, I'm certain, is not the biggest case in terms of dollar figures on the court's calendar. The underlying claims for $25,000, which is the estimated fair market value of the vessel, not because the vessel sank, but that was the limits of insurance. The testimony at trial and in the record is that the cost of repairs for ensuing loss to components that were not in any way directly affected by any lack of maintenance or any rusted corrosion were damaged by the water that came into the boat, flooded into the boat. So the cost of repair is only a little more than the fair market value of the vessel? That's correct. And again, the cost of repairs to components that were damaged only in the ensuing loss. Engine and so on. That's important. It's also important, I believe, that the court appreciate, and I'm sure you do from reading the briefs, that marine insurance policies, including consumer yacht policies, boat policies, even on small boats, are unregulated by insurance commissioners in that they are not reviewed for terms and conditions. So an insurer can sell a policy basically that says whatever they want to include or exclude. And it's up to the court whether or not those terms are enforceable and how to construe those terms. I want to point out that there is an oversight on my part in the briefs and in my response brief. I do cite to and quote from a Ninth Circuit case, 1986, Severe EBRY versus commercial union insurance. I didn't include that in the in the in the case. In the list of cases in the list of a table of authorities. So moving on for assignments of error. I would like to emphasize in my discussion to touch on the third. I would like to focus on the conclusion of law by the trial court that the efficient proximate cause of all damage claimed by plaintiff is lack of reasonable care in the maintenance of the boat. And he continued as well as the buildup of rust. It can't be both. And I believe that L.A. foremost has basically dropped the buildup of rust as a proximate cause. So we'll focus on the lack of reasonable care in the maintenance of the boat. There is a provision. Well, first of all, this is an all risks type of coverage. Coverage is provided for basically all risk of loss. Let me just cut to the chase for me on this case. And that is the central question I have as to whether or not within the terms of the policy exclusion for harm caused by lack of proper maintenance, whether it was proper maintenance or improper maintenance for your client never to replace the elbow riser for your client. Apparently your client in some sense was conscientious that he's had winterized every winter and so on. What's the difference that was presented at trial between the work done for winterizing and the work that would have been done that would have revealed the necessity for maintenance of the elbow riser? There is none whatsoever. What's involved in winterizing? Winterizing would be changing the oil, removing any liquids that would freeze, that type of thing. And that was done. Did your client ever take the vessel during the time he owned it, either to the original dealer from whom he bought it and who did the winterizing at the beginning, or to the man who did the winterizing later, or to anybody else and say, you know, I'm just concerned that maybe there's a, you know, the marine version of a 50,000 mile maintenance. I'm concerned that there may be maintenance that needs to be done. Did your client ever do that? Yes. The first three or four years that he owned the vessel, he took it to the dealer that had originally sold it. He bought it as a used boat from the dealer. That was taken in and anything that was recommended was done. Now, anything that was recommended, do we know what he asked that dealer to do? I mean, did he say winterize it? Did he say, you know, do whatever maintenance is required? What do we know that he asked the dealer to do? I don't know that that was, he did comment that he had basically entrusted maintenance to Mr. Gerke, the mobile mechanic that came to his place, to the home to maintain the yacht, which is a lot more efficient than fairly entering into a dealership. Mr. Gerke certainly understood, and there's testimonies in the record, that he recommended whatever maintenance had to be, should have been done to the vessel. And it wasn't just, it just constrained him to winterizing. But what bothers me here is that apparently if you look into the appropriate manual, which I think your client didn't have, but the appropriate manual for this engine and exhaust system, there was a recommendation that these elbow risers be replaced from time to time if the vessel were operated in salt water. I think the court, and possibly the trial court, was under a misimpression. The testimony was that there was no manual that was provided with the vessel that made any recommendations as to that. Well, I understand that none was provided with the vessel. I understand that. None was provided with the vessel. And there is no specific manual to this particular engine, or this type of engine, the OMC Upward Marine Corporation, which is an engine manufacturer. There were recommendations that were in Mercury manuals and in Avolo manuals, but there was nothing specific in any manual that applied to an OMC engine. Now, how old was the vessel at the time of this incident? Fourteen years old. And it had been run in freshwater for a time, and I'm not quite sure at what year he started to take these trips up to the San Juan. It was up to 2000 is when he first put it into salt water. He used it for five years in salt water sparingly. And then because of the illness of his wife, he did not cruise the vessel in 2006. And in 2007, this was his first time in the water. Now, it is important. What is the evidence presented by the boat owner of maintenance? Okay. The evidence was that he annually called Mr. Gerke after the first two or three years that it was serviced by the distributor, that he annually called Mr. Gerke. Mr. Gerke came out and did whatever maintenance Mr. Gerke chose to do, and further, that he would have done and did do everything that Mr. Gerke recommended so far as any additional maintenance. Now, Mr. Gerke did not specifically recommend anything other than the winterizing. Mr. Gerke's testimony was that he believed that the risers and the manifolds did not need to be replaced more often than every 15 to 20 years, and in this case, that he thought that 15 years would have been appropriate. So he had never inspected the manifolds. Now, I think the court's earlier question centered on the issue is whether Mr. Shepard engaged in proper maintenance of the vessel. He took it to the dealer, and he turned the vessel over, so far as maintenance was concerned, to Mr. Gerke. Our contention is that was proper maintenance from the owner's point, from the owner's standpoint. Now, the ---- Counsel, but this was a bench trial, and the charter fact that district court made a different finding, so we would have to determine that finding was clearly erroneous, wouldn't we? No. The district court determined that as a matter of law, the obligation was basically strict liability. The obligation to properly maintain a vessel applied irrespective of who failed to maintain the vessel. Right, according to the policy provision, right? Supposedly interpreting the policy provision. And then he made a finding of fact that your client did not properly maintain the boat as the manufacturer's manual dictated. Well, I don't believe that he imputed that to Mr. Shepard specifically, only that the recommendations that were contained in some manuals and some websites online, that risers and manifolds should be ---- Well, the boat was not maintained in accordance with those manuals, regardless of whether it was the fault of the person who did the maintenance or your client. The finding was made by the district court that the required maintenance was not done. That's correct. So how is that finding clearly erroneous? Well, I don't think that the finding is clearly erroneous. It's based upon an erroneous application of the law that, as indicated in the Founder's Insurance Company v. Rogers case. So you don't dispute that the manuals require the maintenance to be done? They recommend that risers be inspected more frequently than this had been done. You don't dispute the district court's determination then that the maintenance that was recommended by the manuals was not performed? You don't dispute that finding, that factual finding? Right. What my contention is that Mr. Shepard did all that a Sunday skipper would be expected to do. He was not a mechanic. He hired a mechanic to maintain the vessel. He met his obligations under the insurance policy to reasonably maintain the vessel. You know, it somehow seems to me that a potential defendant or potential defendants here are the original dealer in Mr. Gerke. That is to say, I fully understand and am sympathetic with and believe what you say, that your client did what he thought was necessary. He wasn't shirking. But the people who were supposed to take care of the boat, and if it's correct that he was asking them not only to winterize but to recommend him whatever maintenance was necessary, sounds as though they didn't do what they were asked to do. Well, certainly the court's got a line of questions and I'll respond to any additional questions that you have. But Mr. Gerke paid money for this insurance policy. Mr. Shepard you mean, I'm sorry. Excuse me, Mr. Shepard paid money for this insurance policy. This insurance policy has never, in any court of record anywhere in this country, has never been or any other boat owner's insurance policy has never been construed as imposing the type of liability that the trial court found and this line of questioning has indicated. They've never been construed. They've all been, it's just never been an issue. What do you mean it's never been an issue? What has never been an issue? This type of construction, that there's strict liability for lack of maintenance irrespective of who did it, that the owner could not meet his obligation by hiring appropriate people to do the maintenance. Now what case can you cite to us that has the construction that you urge, that if the owner has hired people to do the maintenance, then he has done all he can do to meet his obligation for maintenance? What's your strongest case authority? Well, there are two cases. One I included in a footnote in the brief. If it's really important you put it in a footnote? It's the proprietor's insurance versus Siegel. But the important case is this court's, the Ninth Circuit's decision in Founders Insurance Company versus Rogers that held that the owner, in that case Sunday Skippers, had met their obligation so far as due diligence and maintenance of the vessel to maintain the vessel and hiring an appropriate person to maintain the vessel. In that case, the issue was a little different. Was that cited in your brief? Oh, definitely, yes. And the issue was a little different in that the coverage wasn't an all-risk policy, but there was coverage for errors in maintaining the vessel or otherwise operating the vessel by master's crew and repairs. And the issue was really one of master and servant in that it was. . . But an all-risk policy is a little different. Oh, yes, yes. To be construed as any loss that's not specifically excluded. And if I could just mention. . . That is correct. An employee. And here is an independent contractor. I don't know if that makes any difference, but the court's language certainly indicates that Sunday Skipper, that is not a professional mechanic, should not be charged with responsibility for any errors so far as maintenance of the vessel and that losses that result from errors by a third party should be covered under the insurance policy in that case and I believe the insurance policy in this case. Okay. Now, you've run over by a minute. Why don't we hear from the other side, but we'll make sure to give you a chance to respond. Okay. Good morning. May it please the Court. My name is Ryan Hall on behalf of Apelli Foremost Insurance. I'd like to go ahead and first go ahead and respond, Judge Fletcher, to the question that you brought up that you felt was the heart of the case. Was there evidence at trial that there was improper maintenance of the boat? What actually did these experts say? And what I'll submit to the Court, and it is part of the record, is that not only did both of the experts and all the literature submitted by them and by my clients all clearly state that you need to take apart this system and look at it every year. You need to replace it, look at it every two to three years and replace it every four to six years beyond all the literature. And again, there's been nothing that's been submitted that indicated that was to the other side. Not only that, but even Mr. Gierke and Mr. Cater, who are plaintiffs' own experts, both testified, and this is both part of the record that the Court has, that these particular components that are at issue in this case were far, far beyond their useful lives and should have been opened up years before this happened, should have been replaced years before this happened. Literally during trial and at depositions, I'm showing these experts photographs of what this stuff looked like when you opened it up, and both of them clearly said, had I been asked to come look at this boat before this loss happened, I would have told an owner. But that takes us to Plaintiff's argument that he entrusted the maintenance of the vehicle to someone he thought was doing whatever was appropriate. What's your response to that and to his reliance on the foremost case? Sure. First, Your Honor, if you actually look at the testimony of Mr. Gierke and who he's relying upon, Mr. Gierke testified specifically, I did not give any advice as to what to do with maintenance to this level. Mr. Gierke is a mobile mechanic. He's not the kind of guy, he is the kind of guy who takes his truck out to your yard, you've got your boat on a trailer, he hooks a hose up to it when you're done using it for the winter and he flushes it out, he does what he's told, he puts antifreeze in it, he tells you to take care of it over the winter and keep it dry, and then I'll come see you next year and here's my bill for $100. When he's deposed, he specifically takes himself out of that equation and says, I never gave any advice as to what should be done with respect to properly maintaining the manifold and risers, which are the parts that are at issue in this case. He completely distances himself from that by saying, I only give my instructions. But if you're a Sunday skipper, like in Founders, which the plaintiff relies on, how would you know to tell the guy what to do? What are you to do? If you give the maintenance to somebody you think knows what they're doing and they don't do it and you don't know what to tell the person, how does that show a lack of due diligence? Well, two things with respect to that, Your Honor. As you see from the record of the experts who testified in this case, this is a standard problem. You see in the record we have there are many, many articles that are produced in the industry, all of which talk about if you do not take care of this maintenance issue and replace these risers and this manifold every four to six years, you are going to have this problem. There is literature out there. So people who are boat owners would know in the general law? Correct, Your Honor. There was plenty of evidence at trial that this is a common problem. I don't think you heard that question. She didn't say people who are experts.  I said boat owners. Correct, Your Honor. And that literature is for boat owners. Everything that was submitted at trial. And what do we have? But I'm still going to push you on this one. What evidence do you have on the record that while it may be for boat owners, that the average boat owner actually has read that and knows that? That's a different proposition. Again, Your Honor, I don't think there's any evidence to show you what the average boat owner does or doesn't do. All we have in this case is experts from, and again, Mr. McLaughlin is an example. He owns a marina. He does this type of work. He's done it for 25 years. He testified, boat owners come into my shop every single year, and I look at my past maintenance records, and I look at what I've done, and every single one that comes to me, they all know after a certain time period I need to do this level of looking at it. They know it's going to cost a little bit more. And in this case, I think what happens is you have a boat owner who is on a fixed income and maybe doesn't have the money to be doing all the things he needs to do, so that's why we have this cheap fix here where we just have someone who comes into his house and picks up a boat. How do you distinguish founder's insurance? In that case, Your Honor, we don't have the same policy provision at issue, and I think what's important is to actually look at the policy provision we're talking about and to see the language of it. Again, the policy provision that we're talking about, and again, this is not a liability case. If this was about liability, I agree with the court, we would be having Mr. Gierke versus Mr. Shepard here. This is not a case about liability. This is a case about coverage. So when we're looking at coverage, we look to the provision which just says, if lack of reasonable care or due diligence in the maintenance of your watercraft causes this loss, we don't cover it. So how does that differ from, and back to my question, how does that differ from the founder's insurance company where we said there was no lack of due diligence when the hired master was responsible for the maintenance? Right. But in that case, Your Honor, respectfully, that was a different policy provision at issue and a different type of loss. You didn't have a case. And what did the policy provision say in that case? I don't have the case here in front of me. Of course, I can get it. I don't have the case here in front of me either, and I don't have that memorized. But what I do recall from briefing on that issue is that the loss that occurred there wasn't about a lack of maintenance that caused a buildup of rust and mold over time with someone who didn't do what they were supposed to do and what the literature told them they needed to do over time. Yeah, I'm not interested in that so much as you said that the policy provision was different, and you're also saying you can't remember that. I don't recall that off the top of my head exactly what the difference was. Now, if I were to go back and read founder's insurance, which I will do as soon as we're off the bench, and if I were to find that, in my view at least, the exclusion in that policy is effectively the same as the exclusion in this policy, do you still win or not? Your Honor, I think we do because the exclusion does say lack of reasonable care or due diligence. I don't think the due diligence is the issue here. I think if the court, and again in this case, all of the testimony from every expert on both sides, was that there was a lack of reasonable care. No, I'm hypothesizing that in Rogers it's effectively the same language as you have here. Right. If that's so, in Rogers, apparently his due diligence was to say to the master, take care of things. The master didn't do it, and the court held that was due diligence. Right, and I think what's important is when you get back to Mr. Gierke's testimony, you're going to find out that he was not told to do everything. It was not placed in his shoes. His testimony is, I was called out to winterize this boat. Winterizing is hooking up a hoist rope, putting antifreeze into it. It is not to the level of what everything needed to be done in this case. He needed to go to someone else for that. And I think Mr. Gierke's testimony on that is very clear. What was Mr. Shepard's testimony as to what his instructions were to Mr. Gierke? Did Mr. Shepard say, I told him, maintain this as it should be maintained? Mr. Gierke's testimony is No, I'm talking about Shepard's. Mr. Shepard's testimony is very vague on that issue. He doesn't know. He had the impression this guy was going to take care of things, but he did admit on cross-exam that he never instructed him to do any of the type of maintenance that we're talking about here today. He was just a guy that would come out and charge you $100 or so to flush out his system and put antifreeze into it. It was not to the level of care that Mr. McLaughlin, the expert on our side, indicated must be done for you. I think it wasn't done. I do think that this is a question of fact. It's been submitted that this is an erroneous conclusion of law. I think when you talk about proximate cause in this case, I think Judge Jones did find this as a finding of fact that was made. I don't think there's any evidence that it was clearly erroneous. Now, I assume that both of you were on board that, in fact, this insurance policy is to be governed by federal admiralty law. Your Honor, actually we dispute that very much, Your Honor. Judge Jones found prior to trial and during trial that Washington law applies, and actually in all the briefing, plaintiff has agreed that with respect to policy interpretation, Washington's law is controlled here. The case law goes back to Justice Story writing circuit. The case is D'Olovio v. Boit holding that marine insurance contracts are admiralty law. I'm not sure that the federal admiralty law is sufficiently different from Washington state law that makes any difference, but this is federal admiralty law. Right. And, Your Honor, when it comes to the only challenge that has been made to that with respect to any of the legal application in this case by plaintiff is that, regarding policy interpretation, policy construction, and all that applies, the only time he points to federal law is when he's talking about causation. And I would agree with the Court, I don't think there's a difference. But I don't think it's disputable, frankly, marine insurance contracts, that's admiralty law. Right. But I think in this case it's not going to matter. I think when you look at the approximate cause issues, those are clearly things that the standard in Commodore Reserves is the same as the efficient approximate cause rule that we're seeing in this case. Counsel, my law clerk pointed out to me that I do have this founder's insurance company case here, and it was issued under English law, which, do you know how that would make a difference, if at all? Again, if you look at that case, Your Honor, and actually read it, and I appreciate the Court's going to do that, that case is completely not analogous to this case. The laws, the language, the law that they apply, it doesn't have any bearing on this case, which is why I didn't spend a whole lot of time with the qualifications we're looking for. I do think this is a case where when you look at the lack of reasonable care, counsel states that he believes that we have given up on rustic corrosion and buildup of rust. But if you actually look at the briefing as well as the testimony of the experts, it is this actual buildup of rust which is what blocks the coolant system from flowing, which results in this thing rupturing. So you do have a chain of events here, Your Honor. I think you do have one unbroken sequence of events that does begin with a lack of reasonable care, and I do think that it could be argued that that is the one and only cause, but I think if you're looking at the chain of causation, you see that all of the steps in that chain of causation are all excluded, and rust is just as valid an exclusion as anything else. Again, I think that this is a case where the challenges have been made regarding ambiguities, but I don't think you actually have any authority or actually evidence that's been submitted to the court at the time of trial or here that these policy versions are ambiguous in any way. The law is fairly clear. Just so I'm trying to understand this case simultaneously as sympathetically as possible to Mr. Shepard and as sympathetically as possible to both sides. From his point, I think, and you can correct me if I'm misunderstanding the operation of the vessel, but my understanding is that there's water intake on two sides and that the water intake on one side continues to function normally, even though on the other side we're running into this problem, but that there's enough water coming into the engine that it never has any warning from an excessive engine temperature. So as far as he's concerned in the operation of the vessel, nothing is wrong. Nothing shows up as wrong. Even elevated temperature in the operating of the engine, nothing's wrong until the thing just blows up on him. Is that right? So he has no warning that this is a brewing problem. Correct, Your Honor, which is why all the literature that you see that's cited in our case and that is testified to during trial, all that literature is warning people. You need to watch out for this because you're not going to get a warning. The location of the thermostats, as far as down the line in this process, doesn't give you that warning so you're not going to have a gauge go on, which is why if you look at SDSER, it starts at 158. That's when you start seeing this literature that was submitted as exhibits at trial. That's where you see everyone telling boat owners, you need to look out for this because you may not get a warning, which is why you, you know, it's not like just changing your oil and your oil is going to go on and goes down. You need to go a little bit beyond that in this case. But I do think that the main arguments are about ambiguity. I think the policy provisions are very clear in this case. There's been no evidence by anyone and no authority that's been submitted to state that these provisions are against public policy, ambiguous or unenforceable in any way. What is your response to the reliance on the notion of strict liability? Again, this is a coverage case, so when someone starts talking about strict liability, those just aren't issues that were ever raised at trial. Those aren't issues that are part of a coverage case. When you look at a coverage case, it's going to be what are the facts, what's the proximate cause, and what is the language of the contract? So, and again, that's an easy step to get into when you're not used to doing first-party coverage work because it's a different set of cases and authority that you're looking at. So strict liability in this case really just had no bearing. It didn't come up and it wasn't argued. This is the first time you're hearing about it because now they're pointing the finger at someone else. As I think I understood his argument, it's something like this, that Mr. Shepard did everything he could to maintain it by telling Mr. Gierke to maintain it, and therefore he satisfied the requirement of the policy. Right. And I think that flies directly in the face of Mr. Gierke's testimony, which you'll see is part of the record. I think it also flies directly in the case of all, sorry, directly in the face of all the authority that we've submitted and all the literature that tells the owners you need to do this. Again, the testimony of trial, including from Mr. Shepard, wasn't I told him maintain my risers, my manifolds, my exhaust system. It was just winterize my boat. Well, what if he told him to do, I thought his testimony was, I told him to do whatever needed to be done and relied on him to do it. If that's the case, if he said, I told him to do whatever needed to be done and I relied on him, does that change your answer? It doesn't change my answer. Why not? Because Mr. Gierke specifically says that's not the case. And the district court found? And the district court found as a finding of fact that Mr. Shepard did not maintain his boat properly and that Mr. Gierke didn't take on that responsibility. Okay. Thank you. Thank you. Mr. Davis, would you like a minute or two to respond? I'll restrict my comments to a couple of things that were said, including the last strung on a couple of sentences. Mr. Gierke did not testify that that was not the case. Mr. Gierke never testified that he was only called to do winterizing. Mr. Gierke said the only thing he did was winterize because he wasn't aware of any other problems, with a couple of exceptions of minor replacements that he did recommend to Mr. Shepard. And Mr. Shepard said, sure, absolutely, repair it. And he did. So that's important. Earlier, counsel for foremost stated that Gierke said, and this is almost a direct quote, that Gierke said that he did not give any advice as to what was to be done so far as what was to be maintained. That's just not in the record at all. Mr. Gierke just plain didn't say that. But wasn't that for the finder of fact to sort out? I mean, there was a bench trial before the judge. The judge heard all of this evidence and made his ruling as to what he gave credence to. So how can we now look behind that and reverse what the district court found? I kind of answered this earlier. The district liability argument? The district liability argument. And a final thing is that counsel for foremost also said that all of this literature, it wasn't all that much literature. There were a couple of maintenance manuals. Maintenance manuals are for repairers that are that thick on different types of engines. And there were some Internet sites, an Internet site that they produced, that the literature was directed at boat owners. It was not. The literature was directed at boat repairers, that they shouldn't watch out for this. Okay. If you want to sum up, your time is up. But if you want to sum up, we'd be happy to hear on it. Okay. There are some other issues. The issue of hidden defect as a latent defect. And there is specific coverage under this policy for assuming loss as a result of a hidden flaw. Okay. And I think that the court should take a look at that. I'm not going to address that. But we saw that in your briefs. Thank both sides for nice arguments. Shepherd v. Foremost Insurance now submitted for decision. The last case on the argument calendar, Prairie Foundation v. Salazar.
judges: Alarcon, Fletcher W. , Rawlinson